USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/31/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                     :

LOCAL 794, TELEVISION BROADCASTING    :
STUDIO EMPLOYEES UNION, I.A.T.S.E.,     :
                                       :

                    Petitioner,    :         21-CV-3821 (VEC)
                                       :

     -against-                :        <u>OPINION & ORDER</u>
                                       :

METROPOLITAN OPERA ASSOCIATION, INC.,  :
                                       :

                  Respondent.   :
                                       :
-----------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Petitioner Local 794, Television Broadcasting Studio Employees Union (the "Union"),

which represents technicians employed by Respondent Metropolitan Opera Association, Inc. (the

"Met"), brought a petition in New York state court to vacate an arbitration award issued pursuant

to a collective bargaining agreement ("CBA").  The Met removed the petition to this Court and

cross-moved to confirm the arbitration award.  The Union moved to remand the case to New

York state court.  For the following reasons, the Union's motion to remand is DENIED; the

Union's petition to vacate the arbitration award is DENIED; and the Met's cross-motion to

confirm the arbitration award is GRANTED.

## BACKGROUND[1]

      The performing arts industry in New York City was hit particularly hard by the COVID-

19 pandemic.  Seeking to generate some revenue after the March 2020 shutdown, the Met

announced an online pay-per-view series of twelve concerts available for streaming.  The

---

[1]     The facts, drawn from the parties' filings, are assumed to be true for the purpose of deciding the present motions.

concerts featured opera singers performing from locations in the United States and Europe.  Pet. to Vacate, Dkt. 1-1 ¶¶ 16–17; Pet. to Confirm, Dkt. 11-1 ¶¶ 10, 14.  The series was hosted by Christine Goerke, an opera singer.  Pet. to Vacate ¶ 18.  The technical work associated with the series was performed by non-union staff from a control room located in New York City but not in the Metropolitan Opera House.  *Id.* ¶¶ 17–18, 24.

The Union, which has represented technicians employed by the Met since 1975, *see id.* ¶ 12, contended that the CBA required the Met to use Union labor to staff the series, *see id.* ¶ 31.  After attempts to resolve the dispute amicably failed, the Union served written notice of its grievance and demanded arbitration pursuant to the dispute resolution procedures in the CBA.  *Id.* ¶¶ 31–34; Pet. to Confirm ¶¶ 9–11.  The parties mutually designated Rosemary Townley as the Arbitrator.  Pet. to Vacate ¶ 35; Pet. to Confirm ¶ 13.

The Arbitrator was tasked with deciding the following issue: "Did the Employer violate the collective bargaining agreement in its staffing of the twelve (12) pay-per-view Metropolitan concerts streamed recital events that commenced in July 2020?  If so, what shall be the remedy?"  Pet. to Vacate ¶ 37; Pet. to Confirm ¶ 12; Arb. Award, Dkt. 13-2 at 2.  On January 12, 2021, the Arbitrator conducted a hearing over Zoom.  Pet. to Vacate ¶ 35; Pet. to Confirm ¶ 13.  The Arbitrator heard testimony from several witnesses, but the proceedings were not transcribed.  Pet. to Vacate ¶¶ 36, 38.  The parties also submitted stipulated facts and seven joint exhibits as part of the arbitration proceedings.  *See* Joint Exhibits & Stipulations, Dkt. 19-2.

On February 18, 2021, the Arbitrator issued an award, denying the Union's grievance and deciding that the Met did not violate the CBA when it staffed the concert series with non-union labor.  Arb. Award at 10.  The Arbitrator analyzed Article I of the CBA, which defines the Union's jurisdiction under the agreement.  *Id.* at 9–10.  With respect to the first part of Article

I(A), which discusses the types of employees covered by the CBA, the Arbitrator found that "there can be no question that the contested work at issue clearly falls within the jurisdiction of the series of classifications and titles set forth in Article A. . . ." *Id.* at 9.  The Arbitrator also found that the requirements of Article I(B), relating to the territorial jurisdiction of the Union, were satisfied because the technical control room used for the concert series was located within 125 miles of the Met.  *Id.*

But the Arbitrator denied the grievance under Article I(C) and the second part of Article I(A).  *Id.* at 10.  Article I(C) states that the CBA applies only "to those television performances of performances at the Metropolitan Opera House which are produced and/or controlled by the Met."  CBA, Dkt. 13-1 at Art. I(C).  The Arbitrator, possibly relying on an outdated version of the CBA, *see* Resp., Dkt. 18 at 18–19, misquoted Article I(C) in the arbitration award; she asserted that the provision limits the applicability of the CBA to "those television performances of Metropolitan Opera performances which are wholly produced and controlled by the Employer," *see* Arb. Award at 2.  In any event, the Arbitrator found that:

> The facts of this case reveal that the [pay-per-view] Met Stars series was a streaming, online production that was wholly directed and controlled by Christine Goerke and not the Met Opera House.  The same company is responsible for the National Opera Auditions which is of a similar nature, as the Met House plays no part in its direction and control.  Moreover, this fact was recognized years ago by the Union when it was acknowledged during the hearing that it never filed a grievance because of its awareness that the conditions surrounding the National Opera Auditions did not meet Article (C).

*Id.* at 10.  Pursuant to the second part of Article I(A), which provides that the "jurisdiction of the Union shall be in accordance with the past practice of the parties," *see* CBA at Art. I(A), the Arbitrator found that past practice indicates that union members were assigned to particular events that occurred in locations other that the Metropolitan Opera House because "the Met had

production and control over them."  The Arbitrator then concluded that "[h]ere, the Met did not

display any similar control" over the pay-per-view series.  Arb. Award at 10.

The Union claims that the Arbitrator's finding that Christine Goerke produced and

controlled the pay-per-view series was irrational because Goerke is an opera singer who does not

have a production company and whose role was limited to hosting the series.[2]  Pet. to Vacate at

¶¶ 18–19, 27, 71–72.  The Union further argues that the Met did not contest during the

arbitration that it controlled or produced the concert series,[3] see Resp., Dkt. 18 at 11, and that a

review of the exhibits submitted to the Arbitrator undisputedly establishes that the series was, in

fact, controlled and produced by the Met, see Pet. to Vacate ¶¶ 16, 20–22, 41–45.

On April 9, 2021, the Union filed a petition in New York County Supreme Court to

vacate the arbitration award pursuant to Section 7511 of the New York Civil Practice Law and

Rules ("CPLR").  Id. ¶ 2.  The Union claimed that Section 7511 requires vacatur because "(a) the

Award was totally irrational and lacked evidentiary support; and (b) the award was so

imperfectly executed that a final and definite award upon the subject matter submitted was not

made."  Id.  On April 29, 2021, the Met removed the case to this Court.  See Not. of Removal,

Dkt. 1.  The Met opposed the Union's petition to vacate the award and cross-moved for

confirmation of the award.  Mem. of Law, Dkt. 12.  The Union moved to remand the case to state

---

[2]      The Union also points out that Goerke was not involved in the "National Opera Auditions," the event
referenced in what the Union considers to be the problematic paragraph of the arbitration award.  The Union further
explains that, as discussed by witnesses at the arbitration hearing, the National Opera Auditions were produced and
controlled by Susan Froemke and her company, Susan Froemke Productions.  Pet. to Vacate, Dkt. 1-1 ¶ 72.  The
Union believes that the Arbitrator confused Christine Goerke with Susan Froemke; this confusion, the Union
believes, led the Arbitrator to err in her conclusion that the Met did not produce the concert series at issue.  Id. ¶ 73.

[3]      The Union further contends that the Met's main contention in the arbitration had nothing to do with who
produced or controlled the pay-per-view series; instead, the Met's argument was that Union labor was not required
under the CBA because the performances did not occur within the four walls of the Metropolitan Opera House.
Resp., Dkt. 18 at 11.

court, *see* Not. of Mot., Dkt. 15, and opposed the Met's motion for confirmation of the award, *see* Resp., Dkt. 24.

## DISCUSSION

### I.       Subject-Matter Jurisdiction and the Union's Motion to Remand

"The federal courts are under an independent obligation to examine their own jurisdiction," *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), and must do so before reaching the merits, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). Accordingly, the Court first considers the Union's motion to remand to determine whether the Court has subject-matter jurisdiction over the petitions to confirm and to vacate the arbitration award.

Because the Met removed this case from state court, it "bears the burden of proving that the case is properly in federal court." *United Food & Com. Workers Union, Loc. 919 v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). For an action properly to be removed to federal court, it must be one that "could have been originally filed in federal court" — that is, one over which a federal court could have exercised original federal subject-matter jurisdiction. *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38 (2d Cir. 1997) (citing 28 U.S.C. § 1441(a)). The parties do not appear to be diverse, *see* Pet. to Vacate ¶¶ 8–9, so removal was only proper if the case presents a federal question pursuant to 28 U.S.C. § 1331.

Usually, when a plaintiff pleads only state law claims, as is the case here, there is no federal question that confers jurisdiction on a federal court. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392–93 (1987). But in certain limited circumstances, a federal statute's preemptive force is "so extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim." *Id.* at 386 (cleaned up); *see also Beneficial Nat'l Bank v. Anderson*, 539

U.S. 1, 8 (2003) ("When the federal statute completely [preempts] the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.").  Accordingly, if a plaintiff "raises . . . a completely preempted state-law claim in [its petition], a court is obligated to construe [it] as raising a federal claim and therefore 'arising under' federal law." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005).

Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, is one of only three statutes that the Supreme Court has held possesses "the requisite extraordinary preemptive force to support complete preemption." *Id.*[4]  Accordingly, for the Court to have subject-matter jurisdiction over this case, the Union's state law causes of action, brought under Section 7511 of the CPLR, must be completely preempted by Section 301 of the LMRA.  If the state law causes of action are completely preempted, then the Court has subject-matter jurisdiction, and the Union's motion to remand must be denied.  Conversely, if the claims are not completely preempted, then the Court lacks subject-matter jurisdiction and the Union's motion to remand must be granted.[5]

"Section 301 governs [1] claims founded directly on rights created by collective-bargaining agreements, and [2] claims substantially dependent on analysis of a collective-

---

[4]     Section 301 of the LMRA provides that:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

[5]     This Court's purported lack of subject-matter jurisdiction is the Union's only argument in support of its motion to remand.  *See* Not. of Motion, Dkt. 15 at 1.

bargaining agreement." *Caterpillar Inc.*, 482 U.S. at 394 (internal citation omitted).  Although either ground is sufficient to find that a state law claim is completely preempted, in this case, the Union's state law claims are preempted on both grounds.

### A. The Union's Claims Are "Founded Directly on Rights" Created by the CBA

In its petition to vacate the arbitration award, the Union asserted two state law claims under CPLR § 7511(b)(1)(iii), which allows a court to vacate an arbitration award when "the arbitrator exceeded his or her power or so imperfectly executed it that a final and definite award upon the matter submitted was not made."  CPLR § 7511(b)(1)(iii); Pet. to Vacate ¶¶ 58–60. The Union argues that CPLR § 7511(b)(1)(iii) supports vacatur for two reasons: (1) the arbitration award is irrational, *see* Pet. to Vacate ¶¶ 61–78; and (2) there was no final and definite award upon the matter submitted, *see id.* ¶¶ 79–83.

The Union's first state law claim — that the arbitration award should be vacated because it is irrational — is "founded directly on rights" created by the CBA.  Just as this Court found in *Collaku v. Temco Serv. Indus., Inc.*, No. 18-CV-4054 (VEC), 2019 WL 452052, at *4 (S.D.N.Y. Feb. 5, 2019), the Union is seeking to enforce its right under the CBA to an arbitral decision that is rational and based in evidence and reason.  As the Court explained:

> New York courts understand the rationality obligation to be a statutorily-imposed constraint on an arbitrator's power over a dispute that is imputed into the legal instrument . . . from which the arbitrator derives his authority.  Like other duties that state law may read into an agreement (the implied duty of good faith and fair dealing being another example), it may be that parties rarely expressly incorporate New York law's rationality obligation into an arbitration agreement.  But it is nonetheless a potent background principle that, under New York law, is automatically integrated into the contract — CBA or otherwise — that gives the arbitrator her power in the first place.

*Id.* at *5 (collecting cases); *see also id.* at *6 ("To attack an arbitrator's award in a labor dispute as irrational under New York law, then, is essentially to assert that the arbitrator violated a duty

implied into the parties' arbitration agreement — and is, therefore, an attack designed to

vindicate a right created by the collective-bargaining agreement . . . .").

Understood in this manner, it becomes clear that the Union's claim that the arbitration

award must be vacated because it is irrational is "founded directly on rights created by

collective-bargaining agreements." *Caterpillar Inc.*, 482 U.S. at 394.  Although the Met relies

heavily on this Court's prior decision in *Collaku*, *see, e.g.*, Mem. of Law, Dkt. 16 at 5; Resp.,

Dkt. 24 at 5–6, the Union does not rebut the Court's logic in that decision or cite any contrary

authority.  Accordingly, the Union's state law claim based on the alleged irrationality of the

arbitration award is completely preempted by Section 301 of the LMRA.

With respect to the Union's claim that there was no final and definite award upon the

matter submitted, it argues that "[e]ven if [its] claim that the Award should be vacated on the

ground of irrationality is preempted [as discussed in *Collaku*]," the Court "has not found the

other grounds for vacatur under the CPLR to be founded directly on rights created by the CBA."

Mem. of Law, Dkt. 16 at 10 (citing *Collaku*, 2019 WL 452052, at *7 n.10).  The Union is correct

that the *Collaku* decision did not discuss whether other grounds of vacatur under CPLR §

7511(b)(1) are preempted by Section 301 of the LMRA.  But a closer look at the Union's second

claim reveals that it is just another way to argue that the award is irrational.  The Union contends

that "the Arbitrator could not make a final decision upon the issue of whether the Met violated

the CBA in its staffing of the [pay-per-view] Series without considering the extensive evidence

that the Met produced or controlled the [pay-per-view] Series."  Pet. to Vacate ¶ 80; *see also id.*

("The Award makes clear that the Arbitrator completely and inexplicably ignored this evidence,

therefore the Award does not resolve the controversy submitted."); *id.* ¶ 82 (referring to the

arbitration award as "confusing and contradictory").  Claiming that the Arbitrator acted

"inexplicably" or in a "confusing and contradictory" manner is a thinly veiled way of contending

that the award must be vacated because the Arbitrator acted irrationally.  Accordingly, for the

same reasons applicable to the first state law claim, this claim is also "founded directly on rights"

created by the CBA.[6]

Because both of the Union's state law claims are founded directly on rights in the CBA,

those claims are preempted by Section 301 of the LMRA.  Accordingly, the Court has subject-

matter jurisdiction over the claims, and the Union's motion to remand the case to state court is

denied.

### B.  The Union's Claims Are "Substantially Dependent on Analysis" of the CBA

Although the Court's finding that the Union's claims are directly founded on rights in the

CBA is sufficient to support preemption, the Court separately finds that the Union's claims are

substantially dependent on an analysis of the CBA, further demonstrating that the Court has

subject-matter jurisdiction over the Union's claims.  The Union argues that "adjudication of the

Union's claims does not require interpretation of the CBA because the meaning of the relevant

CBA provision, Article I.C (whether a production was "produced and/or controlled by the Met")

is undisputed."  Mem. of Law, Dkt. 16 at 8; *see also id.* at 8–9 (arguing that "the Award creates

new controversies because it puts the meaning of whether a production was 'produced and/or

controlled by the Met' into dispute when this had never been contested before." (quoting Pet. to

Vacate ¶ 81)).

But that exact argument has been rejected in an analogous case.  In *Smith v. Wartburg

Adult Care Cmty.*, No. 18-CV-12240, 2020 WL 777336 (S.D.N.Y. Feb. 18, 2020), a union

---

[6]     Moreover, even if the Union's second state law claim were not inextricably intertwined with its irrationality claim, determining whether the Arbitrator entered a "final and definite award" is also founded directly on the right in the CBA to a final arbitration award.  *See* CBA, Dkt. 13-1 at Art. XVII ("The decision of such arbitrator shall be final and conclusive upon the parties hereto . . . .").

initiated arbitration on behalf of one of its members whose employment had been terminated.

Pursuant to the CBA at issue, the employer "retains the exclusive right to . . . discharge for cause

. . . ." *Id.* at *6. The Arbitrator upheld the termination, finding that the employer had "just

cause" to terminate the employee. *Id.* at *2. The employee filed a petition to vacate the award in

New York state court, claiming that, under CPLR § 7511(b)(1)(iii), the award was irrational and

lacked evidentiary support. *Id.* at *6. The employee argued that "he is not challenging whether

there would have been cause to terminate him . . . , but rather is challenging the Arbitrator's

decision based on the evidence and the arbitration proceedings themselves." *Id.* In rejecting that

argument, the court held:

> [T]he heart of Plaintiff's claim is that the Arbitrator erred in his assessment of the
> evidence and ultimate finding that it supported Defendant's decision to terminate
> Plaintiff for cause, as required by the CBA. . . . Thus, determining the propriety of
> the Arbitrator's award will require the Court to interpret the meaning of "for
> cause" in the CBA, and analyze whether the evidence presented, or not presented,
> at the hearing was sufficient to support the Arbitrator's conclusion and application
> of the "for cause" standard in the CBA.

*Id.* Like in *Smith*, any consideration of the rationality *vel non* of the Arbitrator's conclusion that

the Met did not produce and control the series and whether that requires finding that the

Arbitrator did not enter a final award will require interpretation of the CBA's use of the terms

"produce" and "control." Accordingly, the Union's state law claims are substantially dependent

on analysis and interpretation of the CBA.

Additionally, any review of the Arbitrator's conclusion regarding who produced and

controlled the series undoubtedly requires interpreting what "produce" and "control" mean under

the CBA. In addition to finding that Goerke "directed and controlled" the series just as her

company did "for the National Opera Auditions," *see* Arb. Award at 10, the Arbitrator also found

that:

> The evidence of record demonstrates that there were a few occasions when the Met assigned unit members to events [that did not occur in the Met Opera House] that were under its control and production, such as the concert in Prospect Park about 12 years ago, the New Year's Eve coverage of Times Square and Lincoln Center where patrons were interviewed and similar events.  In these cases, however, unit members were assigned to the event and apparently the Met had production and control over them.  Here, the Met did not display any similar control over the [pay-per-view] series.

*Id.*[7]  Any consideration of that conclusion, and whether the concert series is indeed analogous to past practice under Article I(A) of the CBA, would require interpreting the "produced and/or controlled" provision.  Because the Union's state law claims are substantially dependent on analysis of the CBA, those claims are preempted by Section 301 of the LMRA.

The Union next argues that its claims are not substantially dependent on analysis of the CBA because the parties do not contest the interpretation of the pertinent provision of the CBA.  Mem. of Law, Dkt. 16 at 10.  Given the parties' agreement, the Union argues that "[w]hile it may be helpful to consult the CBA to verify that the standard to be applied is whether the Met 'produced and/or controlled' the PPV Series, 'interpretation' of the CBA is not required . . . ."  *Id.* at 8–9.  The Union is correct that "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be [preempted by federal law]."  *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994); *see also Spiegel v. Bekowies*, 669 F. App'x 38, 39 (2d Cir. 2016) ("A state law claim is preempted when its resolution depends on an interpretation of a collective-bargaining agreement, but not merely when a collective-bargaining agreement will be consulted in the course of state-law litigation." (cleaned up)).

To support its contention that resolution of the Union's state law claims requires consulting but not interpreting the CBA, the Union cites two cases that it views as analogous to

---

[7]     Inexplicably, neither the Union nor the Met include much discussion of this paragraph of the arbitration award in their various legal briefs.

the current dispute.  *See* Mem. of Law, Dkt. 16 at 11 (discussing *Wynn v. AC Rochester*, 273

F.3d 153 (2d Cir. 2001); *Jones-Cruz v. Rivera*, No. 19-CV-6910, 2021 WL 965036 (S.D.N.Y.

Mar. 14, 2021)).  In *Wynn*, the Second Circuit overturned a district court's finding that a state

law fraud claim involved interpretation of a CBA.  *Wynn*, 273 F.3d at 156.  The Circuit found

that because "the parties agree about what the CBA provided and that the alleged statements

about the CBA's terms (if made) were false, the fraud claim requires no interpretation of the

CBA, and is therefore not preempted by § 301."  *Id.* at 159.  Similarly, in *Jones-Cruz*, a district

court found it relevant that neither party challenged whether the plaintiff qualified as a senior

employee under the CBA's seniority provisions.  *Jones-Cruz*, 2021 WL 965036, at *6.  The

court held that "while the factfinder might need to consult the CBA to confirm the Complaint's

allegation that Plaintiff is senior to her two White colleagues," the core of the plaintiff's claims

was whether Defendants discriminated against her by favoring white colleagues, a question that

did not require interpretation of the CBA.  *Id.*

But both *Wynn* and *Jones-Cruz* are inapposite to the facts at issue in this case.  Although

the Union alleges that there was no dispute in the arbitration that the Met "produced and/or

controlled" the pay-per-view series, *see* Mem. of Law, Dkt. 16 at 11–12, the Union clearly

disputes the Arbitrator's analysis and conclusions with respect to those terms as laid out in the

arbitration award.  Neither *Wynn* nor *Jones-Cruz* involved a prior arbitration award; because the

only relevant actors in those cases were the parties, the fact that they did not dispute the meaning

of the pertinent term of the CBA was dispositive.  But in this case, because the Arbitrator,

apparently *sua sponte*, found that the Met did not produce or control the series, those terms are

clearly in dispute in this litigation.  In fact, the Union's entire petition to vacate the award is

based on its dispute with the Arbitrator's construction and application of that provision.

Accordingly, any review of the arbitration award pursuant to CPLR § 7511(b)(1)(iii) will be substantially dependent on interpreting that provision of the CBA.

In short, because the Union's state law claims turn on the interpretation of a provision of the CBA, those claims are preempted by Section 301 of the LMRA, and the Union's motion to remand is denied.

## II.   The Court Treats the Union's Claims as Claims Brought Under Section 301 of the LMRA

"[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (internal citation omitted).  The Met argues, in a conclusory fashion, that the Union's petition should be dismissed as preempted, *see* Mem. of Law, Dkt. 12 at 5–6, without explaining why that is the more appropriate course of action.  The Court agrees with the Union that there is no reason for the Court to dismiss its claims.  Resp., Dkt. 18 at 10.  Both parties have argued in support of their respective positions as to the Union's claims, were they to be construed as brought pursuant to Section 301 of the LMRA.  *See* Mem. of Law, Dkt 12 at 6–14; Resp., Dkt. 18 at 10–16; Reply, Dkt 23 at 3–8.  Without any reason to dismiss the claims and there being no prejudice to either side, the Court finds it more appropriate to construe the Union's claims as brought pursuant to Section 301 of the LMRA.

## III.   Section 301 of the LMRA Requires Confirmation of the Arbitration Award

### A.  The Bases for Vacatur under Section 301 of the LMRA Are Narrow

A district court's review of an arbitration award under the LMRA is "narrowly circumscribed and highly deferential."  *ABM Indus. Grps., L.L.C. v. Int'l Union of Operating Eng'rs, Loc. 30*, 968 F.3d 158, 161 (2d Cir. 2020); *see also Nat'l Football League Mgmt.*

*Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 532 (2d Cir. 2016) (noting that the court's review of labor arbitration awards is "among the most deferential in the law"). Courts employ such a high level of deference to avoid "usurp[ing] a function which is entrusted to the arbitration tribunal."  *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509–10 (2001) (cleaned up).

Given the limited judicial review of labor arbitration awards, "if an 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.'"  *Id.* at 509 (quoting *United Paperworks Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)); *see also Garvey*, 532 U.S. at 509 (finding that "the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." (cleaned up)); *Misco*, 484 U.S. at 36 ("The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract."); *Nat'l Football League Mgmt. Council*, 820 F.3d at 532 ("These standards do not require perfection in arbitration awards.  Rather, they dictate that even if an arbitrator makes mistakes of fact or law, we may not disturb an award so long as he acted within the bounds of his bargained-for authority.").

But despite the high level of deference, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. . . . When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."  *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960); *see also Garvey*, 532 U.S. at 509 (reiterating that an arbitrator may not "dispense his own brand of industrial justice").

From this well-settled caselaw, the following principles guide the Court's analysis: (1) vacatur is appropriate when an Arbitrator fails to apply the CBA or act within the scope of the authority conferred by the agreement; (2) serious errors in factfinding do not require vacatur of an arbitration award; and (3) vacatur is required if an Arbitrator dispenses her own brand of industrial justice.  The Court considers each principle in turn.

### B.  The Arbitrator Applied the CBA and Acted Within the Scope of Her Authority

The Arbitrator applied the CBA and acted within the scope of her authority.  The arbitration award analyzes the stipulated issue, which rightly focuses on whether the Met "violate[d] the collective bargaining agreement. . . ."  Arb. Award at 2.  The Arbitrator recited what she found to be the relevant provisions from the CBA and proceeded to analyze those provisions before ultimately denying the Union's grievance and concluding that the CBA did not require the Met to use Union labor on the pay-per-view series.  *See generally* Arb. Award, Dkt. 13-2.[8]  None of the Arbitrator's analysis strays from what she construed to be the pertinent provisions of the CBA.

The Union contends that the Arbitrator did not apply the CBA because she "references and applies the wrong contract."  Resp., Dkt. 18 at 18–19.  The Union appears to be correct that the Arbitrator recited the relevant provisions from the wrong version of the CBA.  *Compare* Arb. Award at 1 (purporting to quote Article I of the CBA in full) *with* CBA at art. I (providing the operative CBA at issue in this dispute); *see also* Resp., Dkt. 18 at 18–19 (suggesting that the Arbitrator may have drawn from an outdated version of the CBA).  But any differences between the two versions of the CBA is minimal.  The only *possibly* meaningful difference is in the first sentence of Article I(C).  *Compare* Arb. Award at 1 ("It is understood that the scope and

---

[8]        In addition, the Arbitrator made detailed findings of fact and recounted the positions of the parties.  *See* Arb. Award, Dkt. 13-2 at 3–9.

jurisdiction described in this Article I refer to only those television performances of Metropolitan Opera performances which are wholly produced and controlled by the Employer.") *with* CBA at art. I(C) ("It is understood that the scope and jurisdiction described in this Article I refer only to those television performances of performances at the Metropolitan Opera House which are produced and/or controlled by the Met.").

Although the Union points out that the word "wholly" is not found in the operative CBA but is found in the version of the CBA referenced by the Arbitrator, *see* Resp., Dkt. 18 at 18–19,[9] the Union does not argue that the Arbitrator's finding turned on that word or that she would have made a different finding had she quoted the CBA correctly.  The Union instead argues that the Arbitrator's conclusion that Goerke "produced and controlled the series" was wrong, given both "the irrefutable evidence cited by the Arbitrator and acknowledged in the Award itself that the series was 'produced and/or controlled by the Met,'" *see id.* at 1, and the Arbitrator's likely confusion between Christine Goerke with Susan Froemke, *see* Pet. to Vacate ¶¶ 18–19, 27, 71–73.  Assuming that the Union is correct and the Arbitrator indeed confused Christine Goerke with Susan Froemke, she would have reached the same conclusion regardless of whether the CBA referred to performances "wholly produced and controlled" or simply "produced and/or controlled" by the Met.[10]  Put another way, the purported error in the arbitration award had nothing to do with the use of the term "wholly produced and controlled" in the Arbitrator's

---

[9]     As the Met points out, the Union makes this argument for the first time in its response brief; it is not included in its petition to vacate the arbitration award.  Reply, Dkt. 23 at 6.  Although the Court usually does not consider arguments made for the first time in opposition briefing, because the response brief was the first time the Union argued its case in the context of Section 301 of the LMRA, the Court will, in its discretion, consider the argument here.

[10]     Moreover, "wholly produced and controlled" is a stricter standard than "produced and/or controlled." Given that the Arbitrator concluded that Christine Goerke "wholly directed and controlled" the concert series at issue, *see* Arb. Award at 10, she undoubtedly would have concluded that Goerke "directed and/or controlled" the series.

recitation of the CBA; she would have reached the same conclusion even if she had quoted the current version of the provision ("produced and/or controlled").

Given the deferential standard of review, the Court is concerned only with whether the Arbitrator "even arguably constru[ed] or appl[ied] the contract." *Garvey*, 532 U.S. at 509. Because the provisions of the CBA applied by the Arbitrator are similar in substance to the provisions of the operative CBA and because any differences were not material to the Arbitrator's findings, the Arbitrator has arguably construed and applied the CBA.

The Union next argues that the Arbitrator exceeded the scope of her authority by "effectively changing the meaning of 'produced and/or controlled.'"  Resp., Dkt. 18 at 18.  But that argument is just another way of asserting that the Arbitrator made factfinding mistakes that led her to conclude that the series was neither produced nor controlled by the Met.  The Union does not object to the Arbitrator's comparison of the pay-per-view series to other events, like the concert in Prospect Park or the New Year's Eve event.  Arb. Award at 10.  Because the CBA, both as quoted by the Arbitrator and as provided by the parties, provides that the "jurisdiction of the Union shall be in accordance with the past practice of the parties," *see* CBA at art. I(A), and so it did not exceed the Arbitrator's authority to look to prior events.[11]  Because analysis of past practice, whether done correctly or erroneously, does not change the meaning of the terms of the CBA, the Union has not demonstrated that the Arbitrator exceeded her authority under the agreement.

---

[11]     The Arbitrator admittedly erred when she confused the producer of the National Opera Auditions (Susan Froemke) with the host of this series (Christine Goerke).  But had Susan Froemke's company actually played the same role in this series as it did in the National Opera Auditions, no one would — or could — argue that the Arbitrator exceeded her authority by relying on that fact.

In short, none of the Union's arguments that the Arbitrator failed to apply the CBA or that she exceeded her powers under the CBA is availing.

### C. Even If the Arbitrator Committed Serious Factfinding Errors, that Does Not Require Vacatur

For the reasons already discussed, each of the Union's arguments boils down to the argument that the Arbitrator's finding of fact that the concert series was not produced or controlled by the Met was clearly erroneous. *See, e.g.*, Resp., Dkt. 18 at 1 (The Arbitrator "determined that the Union did not have jurisdiction over the series of performances at issue solely because she found that . . . the host of the series, Christine Goerke, produced and controlled the series, despite the irrefutable evidence cited by the Arbitrator and acknowledged in the Award itself . . . .").[12]  Assuming the Union's argument is correct, and that the Arbitrator made serious errors in her factfinding, that does not, standing alone, require the Court to vacate the award. *See Garvey*, 532 U.S. at 509 ("When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." (quoting *Misco*, 484 U.S. at 39)).  And although the Court readily admits that, had the issue been before the Undersigned, the Court likely would not have relied on Goerke's role in the concert series to deny the Union's grievance, "it is not [the Court's] task to decide how [it] would have conducted the arbitration proceedings, or how [it] would have resolved the dispute." *See Nat'l Football League Mgmt. Council*, 820 F.3d at 537.  In short, even assuming the Union is correct

---

[12]      *See also* Resp., Dkt. 18 at 11 (arguing that the Arbitrator's finding was "in direct contradiction to the undisputed record evidence"); *id.* (contending that "there was not a scintilla of evidence that Goerke produced or controlled the [pay-per-view] Series because it is a false statement"); *id.* (highlighting that "[a]ll the evidence submitted to the Arbitrator establishes that the [pay-per-view] Series was produced and controlled by the Met . . . ."); *id.* (discussing how each piece of evidence — including the July 2020 press release, the series' closing credits, and video clips of the host's opening and closing remarks — support the Union's contention that the Met controlled and produced the series).

and the Arbitrator's factfinding was clearly erroneous, that is not enough to warrant vacatur of the arbitration award.

### D.  The Arbitrator Did Not Dispense Her Own Brand of Industrial Justice

The Union argues that the arbitration award is based on the Arbitrator's own brand of industrial justice.  After reviewing the Arbitrator's factfinding errors in detail, *see* Resp., Dkt. 18 at 11, the Union argued that "the Arbitrator effectively rewrote the jurisdictional clause of the CBA and dispensed her own brand of industrial justice."  *Id.* at 11–12.  But the Supreme Court has held that irrational factfinding does not constitute "industrial justice."  In the *Garvey* case, the Supreme Court overturned the Ninth Circuit's finding that an arbitration award should be vacated because the Arbitrator dispensed his own brand of industrial justice.  *Garvey*, 532 U.S. at 507–08.  The Supreme Court held:

> The substance of the [Ninth Circuit's] discussion reveals that it overturned the arbitrator's decision because it disagreed with the arbitrator's factual findings, particularly those with respect to credibility.  The Court of Appeals, it appears, would have credited [a particular piece of evidence], and found the arbitrator's refusal to do so at worst "irrational" and at best "bizarre."  But even "serious error" on the arbitrator's part does not justify overturning his decision, where, as here, he is construing a contract and acting within the scope of his authority.

*Id.* at 508.  Under *Garvey*, even if the Court were to agree with the Union that the Arbitrator's factfinding was "irrational" and in "serious error," that would not be enough to find that the Arbitrator had dispensed her own brand of industrial justice.

The Union does not cite any caselaw in which a court properly found that an award should be vacated because the Arbitrator dispensed her own brand of industrial justice.[13]  Such

---

[13]     The Union does cite *Loc. 1199, Drug, Hosp. & Health Care Emps. Union v. Brooks Drug Co.*, which notes that courts are required "to determine whether the arbitrator interpreted an arguably ambiguous contractual provision in light of the intent of the parties, or merely administered his own brand of justice in contradiction of the clearly expressed language of the contract."  956 F.2d 22, 26 (2d Cir. 1992).  The Union contends that declaring the host of the concert series to be its producer does not reflect "the intent of the parties" because neither the Met nor the Union argued that the host produced or controlled the series.  Resp., Dkt. 18 at 11.  But *Local 1199* is referencing the parties' intent in the context of an Arbitrator interpreting an arguably ambiguous provision in a contract, and not the

decisions appear to be far and few between.  But in one such case, the Third Circuit found that where an Arbitrator "injects a restriction into a contract to which the [employer] did not agree and to which the bargaining unit employees are not entitled, he dispenses his own brand of industrial justice and should be overturned."  *Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*, 946 F.3d 195, 201 (3d Cir. 2019).  But that is not analogous.  The Union is not asserting that the Arbitrator created and applied a new jurisdictional requirement out of whole cloth; instead, it is arguing that the Arbitrator misapplied the facts when she concluded that an undisputed jurisdictional requirement in the CBA was not satisfied.[14]  In short, although she engaged in questionable factfinding, the Arbitrator did not dispense her own brand of industrial justice.

Because the Arbitrator applied the terms of the contract, acted within the scope of her authority, and did not dispense her own brand of industrial justice, there is no basis to vacate the arbitration award.[15]  Accordingly, the Union's petition to vacate the arbitration award is denied, and the Met's motion to confirm the award is granted.

---

parties' intent with respect to their own arguments made before the Arbitrator.  Here, neither party contends that the clause in the CBA limiting jurisdiction to events "produced and/or controlled by the Met" is ambiguous.  Accordingly, the dicta in *Local 1199* is not helpful to the Union.

[14]     The Union also argues that the Arbitrator applied her own brand of justice "by requiring the contested work to be '*wholly* produced and controlled by the Employer.'"  Resp., Dkt. 18 at 12 (emphasis in original).  For the same reasons described *supra*, the Arbitrator's conclusion did not turn on the word "wholly," and she would have reached the same conclusion even if she had considered whether the concert series was "produced and/or controlled by the Met."  Accordingly, the Arbitrator's incorrect inclusion of the adverb "wholly" does not rise to the level of dispensing "industrial justice."

[15]     The Union further argues that vacatur is appropriate because the award contravenes public policy.  By stripping Susan Froemke and her company of "rightful ownership of and control over the publicity of her work in connection with 'The Audition,'" while falsely claiming that Christine Goerke is the producer of the pay-per-view series and Froemke's film, *see* Resp., Dkt. 18 at 15, the Union contends that the arbitration award contradicts "the strong public policy against conferring rights and privileges to an individual to which he or she is not entitled under law and in favor of protecting the ownership of creative work," *see id.* (citing Section 1125(a)(1)(A) of the Lanham Act).

But as the Union itself acknowledges, the "relevant inquiry is 'whether the award itself, as contrasted with the reasoning that underlies the award, creates an explicit conflict with other laws and legal precedents' and thus

**CONCLUSION**

For the foregoing reasons, the Union's motion to remand the case is DENIED, the Union's petition to vacate the arbitration award is DENIED, and the Met's cross-motion to confirm the arbitration award is GRANTED.  Accordingly, the arbitration award is hereby CONFIRMED.

The Clerk of Court is respectfully directed to enter judgment in favor of the Metropolitan Opera Association, Inc.  The Clerk is further directed to terminate all open motions and to close this case.

**SO ORDERED.**

Date:  **March 31, 2022**
       **New York, NY**
                                  **VALERIE CAPRONI**
                                  **United States District Judge**

---

clearly violates an identifiable public policy.'" *Id.* at 14–15 (quoting *St. Barnabas Hosp. v. 1199SEIU*, No. 16-CV-4117, 2016 WL 4146143, at *3 (S.D.N.Y. Aug. 2, 2016) (cleaned up)).  Here, the award itself does not mention trademarks or other protections afforded to the owners of creative work.  Because the arbitration award presents no explicit conflict with the Lanham Act, or any other laws and legal precedents, the public policy exception does not apply.